**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

—————————————————————————

RICHARD KENNEALLY,

                                        Plaintiff,

        v.                                                    No. 07-CV-647
                                                                      (DRH)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

—————————————————————————

**APPEARANCES:**                          **OF COUNSEL:**

ERWIN, McCANE & DALY                 THOMAS C. ERWIN, ESQ.
Attorney for Plaintiff
23 Elk Street
Albany, New York 12207

HON. ANDREW T. BAXTER                 JOHN M. KELLY, ESQ.
United States Attorney for the        Special Assistant United States Attorney
    Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER**

        Plaintiff Richard Kenneally ("Kenneally") brings this action pursuant to 42 U.S.C.

§ 405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for benefits under the Social Security Act.

Kenneally moves for a finding of disability and the Commissioner cross-moves for a

judgment on the pleadings.  Docket Nos. 11, 14.  For the reasons which follow, it is

recommended that the Commissioner's decision be affirmed.

**I. Procedural History**

On January 26, 1999, Kenneally filed an application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. T. 74-83.[1] That application was denied on May 7, 1999. T. 20-22. Kenneally requested a hearing before an administrative law judge ("ALJ"), which was held before ALJ J. Lawson Brown on January 19, 2000. T. 34-37, 603-32. In a decision dated April 26, 2000, the ALJ held that Kenneally was not entitled to disability benefits. T. 42-50. On June 13, 2000, Kenneally filed a request for review with the Appeals Council. T. 51-54. The Appeals Council granted Kenneally's request for review on October 30, 2001, and remanded the action back to the ALJ for reconsideration. T. 230-33. A supplemental hearing was held before ALJ Brown on January 31, 2002. T. 511-32. In a decision dated February 4, 2002, the ALJ again held that Kenneally was not entitled to disability benefits. T. 258-66.

After another timely request was submitted to the Appeals Council on March 2, 2002, the Council again granted the request, this time remanding the case to ALJ Carl Stephan for resolution. T. 290-93. A supplemental hearing was held on July 4, 2004 and continued on November 9, 2004 before ALJ Stephan. T. 583-602, 533-582. In a decision dated January 4, 2005, the ALJ held that Kenneally was not entitled to disability benefits. T. 10-19. After a timely request was submitted to the Appeals Council, on May 11, 2007 the Council denied Kenneally's request, thus making the ALJ's findings the final decision of the Commissioner. T. 4-9. This action followed.

---

[1]"T." followed by a number refers to the page of the administrative record. Docket No. 10.

## II. Contentions

Kenneally contends that the ALJ erred in finding that (a) Kenneally's musculoskeletal impairments did not meet or equal the listed criteria for a disability per se, (2) his physical impairments, either alone or in combination, were not of sufficient severity to constitute a listed condition, (3) Kenneally was not credible concerning his statements of pain and disability, (4) Kenneally retained sufficient residual functional capacity (RFC), and (5) Kenneally was not disabled.

## III. Facts

Kenneally is currently fifty-three years old and completed high school and two years of training in automobile mechanics.  T. 536.  Kenneally has previously worked as a laborer and driver for the highway department, store clerk, maintenance man, and laborer at a game farm.  See e.g., T. 86.  Kenneally alleges that he became disabled on December 25, 1998 due to musculoskeletal complaints, diabetes, and gastrointestinal problems.  T. 14.

## IV.  Standard of Review

### A. Disability Criteria

"Every individual who is under a disability shall be entitled to a disability. . . benefit. . . ."  42 U.S.C. § 423(a)(1) (2004).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a

continuous period of not less than 12 months." Id. § 423(d)(1)(A).  A medically

determinable impairment is an affliction that is so severe that it renders an individual

unable to continue with his or her previous work or any other employment that may be

available to him or her based upon age, education, and work experience.  Id. §

423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical

and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the

impairment is "based [upon] objective medical facts, diagnoses or medical opinions

inferable from [the] facts, subjective complaints of pain or disability, and educational

background, age, and work experience."  Ventura v. Barnhart, No. -4 Civ. 9018(NRB),

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d

1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he [or she] is not, the
> [Commissioner] next considers whether the claimant has a 'severe
> impairment' which significantly limits his [or her] physical or mental ability
> to do basic work activities.  If the claimant suffers such an impairment, the
> third inquiry is whether, based solely on medical evidence, the claimant
> has an impairment which is listed in Appendix 1 of the regulations.  If the
> claimant has such an impairment, the [Commissioner] will consider him [or
> her] disabled without considering vocational factors such as age,
> education, and work experience; the [Commissioner] presumes that a
> claimant who is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.  Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to perform his
> [or her] past work.  Finally, if the claimant is unable to perform his [or her]
> past work, the [Commissioner] then determines whether there is other
> work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  The plaintiff bears the initial

burden of proof to establish each of the first four steps.  DeChirico v. Callahan, 134

F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry

progresses to the fifth step, the burden shifts to the Commissioner to prove that the

plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing

Berry, 675 F.2d at 467).


### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supports the decision.  Berry, 675 F.2d at 467.  Substantial evidence is "more than a

mere scintilla," meaning that in the record one can find "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" Halloran v.

Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389,

401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with

sufficient specificity to allow a court to determine whether substantial evidence supports

the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y.

2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court

cannot substitute its interpretation of the administrative record for that of the

Commissioner if the record contains substantial support for the ALJ's decision.  Yancey

v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported

by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at

31.

## V.  Discussion

## A. Medical Evidence

### 1. Work History

Kenneally alleges that he became disabled on December 25, 1998 due to musculoskeletal complaints, diabetes, and gastrointestinal problems.  T. 14.  Kenneally has not engaged in any substantial gainful activity after that date.  Id.  He did attempt to return to work at the game farm from March until June, 2002 and at a McDonald's restaurant doing maintenance from March until July, 2003, but his medical conditions caused him to terminate his employment.  T. 589-90, 537, 540, 542.

### 2. 1998 - 2000

On July 23, 1998, Kenneally began treatment at St. Peter's Hospital ("St. Peter's") for bilateral leg pain.  T. 158-59.  Upon his initial visit, staff noted that KENNEALLY was also suffering from diabetes, he was obese and non-compliant with the diabetes diet, and the pain in his legs could be related to circulatory problems or neuropathy secondary to his diabetes.  T. 158-59.  On July 31, 1998, during a follow-up appointment, staff noted that Kenneally's diabetes was under better control, but he was still complaining of bilateral leg pain and had a possible diagnosis of carpal tunnel syndrome.  T. 156-57.

On December 21, 1998, Kenneally returned for a follow-up appointment.  T. 151-52.  Kenneally stated that he was obtaining relief from over-the-counter pain medication and he had a history of degenerative disc disease.  T. 151.  Upon examination,

6

Kenneally's knees showed signs of crepitus[2] and there was pain in his left knee when testing his range of motion.  T. 152.  Kenneally was diagnosed with degenerative joint disease, which was noted to be a longstanding problem.  Id.  On January 4, 1999, x-rays of Kenneally's knees were unremarkable.  T. 131, 132.

On January 8, 1999, Kenneally returned to St. Peter's complaining of (1) increased and ongoing pain in his knees which was aggravated by standing or sitting in one location, (2) difficulty transferring in and out of his car, and (3) the inability to work.  T. 133-34, 142.  Examination revealed no changes and Kenneally was referred to physical therapy.  T. 133, 142.  A month later, Kenneally continued to complain of chronic knee pain despite therapy three times a week.  T. 127, 135.  Examination of Kenneally's joints showed abnormalities, he ambulated with an antalgic gait,[3] and he exhibited pain when the range of motion in his knees was assessed.  T. 128, 136.  Kenneally was referred for an orthopaedic consultation.  Id.

On February 12, 1999, Kenneally was examined by an orthopaedist, Dr. Hea Lew.  T. 160-62. Lew noted that for the past year, Kenneally had moderate to severe, constant, dull, aching pain in his lower back, legs, and knees.  T. 160.  The pain sharpened at night and made it difficult to ambulate.  Id.  Kenneally reported that he could not walk a city block on level ground, could not stand in one place for half an hour, could not do laundry or go grocery shopping, and could no longer go out, do

---

[2] Crepitus is "the grating sensation caused by the rubbing together of the dry synovial surfaces of [the] joints."  DORLAND'S ILLUSTRATED MED. DICTIONARY 391 (28th ed. 1994) [hereinafter "DORLAND'S"].
[3] An antalgic gait is a "posture or gait assumed so as to lessen pain."  DORLAND'S 90.

crafts, or play sports.  Id.  However, Kenneally also stated that he did not use a cane, was able to sit in a chair for half an hour, climb a flight of stairs, carry a small bag of groceries and a gallon of milk, cook, and dress himself, and spent most of the day watching television, listening to the radio, or reading.  Id.

Upon examination, Dr. Lew noted that Kenneally had a normal appearance and gait, he was able to walk slowly on his heels and toes without the assistance of any devices, and he needed no assistance getting on and off the examination table or changing for the evaluation.  T. 161.  Kenneally had normal ranges of motion in his cervical spine, shoulders, elbows, forearms, wrists, and fingers.  Id.  Dr. Lew also noted no instability of the knees as their reflexes and strength were normal and equal, but, the x-ray of the right knee showed mild osteoarthritic changes[4].  T. 161, 163.  An x-ray report of Kenneally's lumbar spine revealed disc space narrowing at L4-5 and L5-S1 but no spondylolisthesis[5] or spondylolysis.[6]  T. 163.  Additionally, Dr. Lew found that Kenneally had severe chronic aches and weaknesses of both legs, feet, and lower back.  T. 162, 163.  Dr. Lew also noted that Kenneally's diabetes was being treated with pills but his morbid obesity led to a guarded prognosis since the excess weight was "not helping the condition."  T. 162.  Dr. Lew concluded that Kenneally had "[m]oderate to severe limitations in standing, climbing stairs, . . .  walking in and around the house, and

---

[4] Osteoarthritic changes are caused by osteoarthritis, which is a "noninflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane . . . accompanied by pain . . . and stiffness . . . ."  DORLAND'S 1199.

[5] Spondylolisthesis is the "forward displacement of one vertebra over another . . . usually due to a developmental defect . . . ."  DORLAND'S 1563.

[6] Spondylolysis is the "dissolution of a vertebra . . . ."  DORLAND'S 1563.

[participating in] community activities."  Id.

On April 13, 1999, Kenneally was seen by another orthopaedist, Dr. Paul Hospodar.  T. 178.  Dr. Hospodar noted weakness in Kenneally's right quadricep, that his deep tendon reflexes appeared diminished, the radiology reports of his lumbosacral spine showed degeneration throughout, and he suffered from lower back pain and a possible herniated disc.  Id.  An MRI showed mild, generalized lumbar spondylosis with mild and diffuse disc bulges at L2-3, L3-4, L4-5, and L5-S1, vertebral bodies with a generally normal morphology, and scattered small Schmorl's nodes.[7]  T. 179, 367.

On April 30, 1999, Kenneally's first physical RFC assessment was completed by Richard Blazer.  T. 165-72.  Blazer found disability due to diabetes and pain and numbness in the legs.  T. 165.  Blazer found that Kenneally could (1) occasionally lift ten pounds, (2) frequently lift less than ten pounds, (3) stand or walk for a total of two hours in an eight-hour work day, and (4) sit for a total of six hours in an eight-hour workday.  T. 166.

On May 10, 1999, Kenneally returned to Dr. Hospodar complaining of continuing back pain which was not alleviated by physical therapy.  T. 177.  Dr. Hospodar recommended continuing the therapy and taking pain medication.  Id.  On May 24, 1999, Kenneally was evaluated by another orthopaedist at Albany Medical Center, Dr. Barton Sachs.  T. 182-87.  Kenneally's primary complaint was back and bilateral leg pain which radiated down both legs into his feet, had worsened over the last year, and bothered him when he sat or drove for long periods of time.  T. 182.  Kenneally reported

---

[7] Schmorl's nodes or nodules are "seen in radiographs of the spine [and are] due to prolapse of a nucleus pulposus into an adjoining vertebra."  DORLAND'S 1145.

that sitting, standing, walking, and bending aggravated his pain, he could only walk half

a city block before needing to rest, his pain was worse in the evening when resting or

sleeping and when the weather turned cold and damp, and the physical therapy had

been of no assistance.  Id.  Dr. Sachs noted that Kenneally was not in distress, he

could push up on his toes and heels, bend down and touch his upper calves, and

retained full range of motion in his lumbosacral spine, shoulders, and trunk.  T. 183.

Additionally, Sachs noted that the x-rays and MRI taken in April showed no evidence of

a true herniated disc, displaced disc fragment, neurologic compression, or facet

hypertrophy.  T. 183-84.  Dr. Sachs' impression was that Kenneally suffered from

marked lumbar spondylosis and spondyloarthropathy[8] and diabetes, that his smoking

habit and high blood pressure probably contributed to his leg discomfort, and that he

should be able to return to work in a "capacity consistent with his physical capacity after

the work tolerance program has been completed."  T. 184.  The list of medications that

Kenneally provided also did not indicate any side effects.  Id.

On July 8, 1999, Kenneally had another follow-up examination at St. Peter's for

his knee pain at which the staff recommended swimming, weight loss, and another

orthopaedic referral.  T. 140-41. On July 14, 1999, Kenneally was examined by his

primary care physician, Dr. Carolyn Grosvenor.  T. 197.  She found Scheuermann's

Disease[9] with marked lumbar spondylosis and spondyloarthropathy causing chronic

---

[8] Spondyloarthropathy is a "disease of the joints of the spine." DORLAND'S 1563.

[9] Scheuermann's Disease is "[a] relatively common condition [which generally presents in adolescent boys] in which backache and [a hunched over posture] are associated with localized changes in the vertebral bodies."  THE MERCK MANUAL 2414 (17th ed. 1999).  Generally, the "[m]ild, nonprogressive cases can be treated by reducing weight-bearing stress and by avoiding strenuous activity."  Id.

back pain.  Id.  Additionally, it was noted that his pain increased with physical activity, he was scheduled for further orthopaedic evaluation, and he had attempted to return to work but was experiencing so much pain that he stopped pending further evaluation and treatment.  Id.  Dr. Grosvenor also completed an employability assessment which indicated that Kenneally was disabled and unable to work due to lumbar spondylolsis and chronic back pain.  T. 198.  She indicated that while Kenneally's diabetes was under control, he was still severely limited in his ability to stand, walk, lift, carry, push, pull, bend, and climb stairs and moderately limited in his ability to sit.  Id.  Dr. Grosvenor indicated that while Kenneally was unable to complete his current job due to pain, he "might be suitable for a totally sedentary position."  T. 199.

On July 19, 1999, Kenneally had his third orthopaedic consult, with Dr. Bryan Bilfield.  T. 173-74.  Kenneally advised that the pain in his leg was intermittent, occurring once or twice a week and lasting for five to ten minutes at a time.  T. 173.  Dr. Bilfield noted that Kenneally had normal strength and intact sensation in both lower extremities, the radiology films of his spine showed narrowing at L5-S1, he had previously been seen by two other orthopaedists and none of the three had any specific recommendations since Kenneally was not a surgical candidate, and Dr. Bilfield's recommendation was pain management for Kenneally's symptoms.  T. 173-74.

On January 27, 2000, Kenneally was examined by an endocrinologist, Dr. Gary Bakst.  T. 189-92.  Dr. Bakst had treated Kenneally for approximately twelve months, and was asked to complete a diabetes medical source statement.  Id.  Dr. Bakst noted that Kenneally had appointments every four months and that he had a fair prognosis despite his symptoms of pain in his extremities, numbness, difficulty walking, and

diminished vibratory sensations.  T. 189.

On January 31, 2000, Kenneally complained to Dr. Grosvenor of bilateral leg and back pain.  T. 194, 196.  Dr. Grosvenor noted that the x-rays of Kenneally's knees were unremarkable, his MRIs showed mild, generalized spondylosis, his pain was unresponsive to physical therapy and over-the-counter pain medication, and the pain rendered him unable to work.  T. 194.  In the opinion of his primary care physician, Kenneally "ha[d] been disabled due to knee pain since at least [December 31, 1998] and back pain since at least [February 8, 1999].  The cause of the knee pain is unknown [and t]he cause of the back pain is probably mild arthritis and musculoskeletal pain."  Id.  On February 1, 2000, Kenneally complained to Dr. Hospodar of increased back pain which had not w improved with any of the conservative treatment methods previously attempted.  T. 193.  Dr. Hospodar recommended a consultation with Dr. Allen Carl, an orthopedist, expressing concern that Kenneally may have spinal stenosis and need another MRI.  Id.  However, Dr. Hospodar stressed that short of Dr. Carl recommending a new solution, Dr. Hospodar had little left to offer Kenneally as they had "exhausted conservative measures."  Id.

On March 2, 2000, Kenneally completed a patient questionnaire which indicated that he lived in an apartment, traveled by car, and, despite relying heavily on his wife, required no assistance with his personal care, meals, finances, or transportation.  T. 354.  The accompanying physical examination found that Kenneally experienced knee pain with weight bearing but retained full range of motion and had no swelling.  T. 351. On May 26, 2000, Kenneally had a follow-up appointment with Dr. Grosvenor where there was no mention or notation of arthritis, joint pain, or problems with ambulation and

range of motion.  T. 352-53.

On May 31, 2000, Kenneally was examined by his fourth orthopaedist, Dr. Carl. T. 205-06.  Dr. Carl noted that the radiology results showed thoracic osteophytes, which were not uncommon in disc disease, and an appreciable amount of arthritis in the upper spinal area.  T. 205.  Dr. Carl referred Kenneally for a sensory potential examination since his prior MRI showed arthritis, but no squeezing of the spinal cord.  T. 206.

Two months later, Kenneally underwent the sensory potential examination.  T. 209-14, 368-73.  The conclusion from the examination was that an abnormality suggestive of conductive defects in Kenneally's nervous system.  T. 209, 211, 368, 371. On October 4, 2000, Dr. Carl examined Kenneally again and recommended an MRI of his cervical spine to determine the cause of the abnormality.  T. 204.  Dr. Carl concluded that if no abnormality was seen in the upper spine, "it means that his spinal cord for some reason has seen a slowing in conduction and there is nothing we can do to change that."  Id.  Dr. Carl recommended that Kenneally continue to take Motrin as needed and to consider pursuing pain management.  Id.

On October 10, 2000, radiology results showed that there was "nothing that [wa]s actually seen to be strangling his spinal cord," the abnormalities that had been seen were associated with arthritic changes, there was no overt stenosis present, and an MRI of the brain was recommended since there were no abnormalities noted in the upper spine that would explain the sensory potential results.  T. 203, 208, 366, 374. The next week, an MRI of the brain returned normal results.  T. 207.  On November 1, 2000, Dr. Carl concluded that there was "nothing . . . strangling [Kenneally's] spinal cord so, therefore, in the past [Dr. Carl] perceive[d] that he ha[d] just not had a big

enough space for his spine" and nothing could be done to improve the spinal space.  T. 202.  Dr. Carl recommended that Kenneally continue with his pain medication and concluded that there was no surgical intervention available and that Kenneally's spinal space may have been injured previously and might not improve.  Id.

### 3. 2001 - 2004

On January 24, 2001, Kenneally was again evaluated by Dr. Bakst who noted that (1) Kenneally was generally feeling well, (2) his blood sugar levels had been controlled, and (3) smoking cessation and weight loss had been discussed.  T. 362-63.  On June 27, 2001, Dr. Bakst again noted that Kenneally's blood sugar was improving, his feet had improved sensation, and smoking cessation was again emphasized.  Five months later, Dr. Bakst again noted that Kenneally "is generally feeling well," was doing a reasonably good job controlling his diabetes, and discussed the importance of smoking cessation.  T. 358.

On December 21, 2001, Kenneally was evaluated by a neurologist, Dr. Matthew Murnane, to determine the cause of the pain which was radiating down his back.  T. 375.  Kenneally was noted still to be smoking, had full motor strength and deep tendon reflexes, exhibited a normal gait, and only complained of mild tenderness to palpation in the lumbar spinal area.  T. 376.  The impression was "chronic low back pain which is likely a musculoskeletal basis [with] . . . no objective evidence [to conclude] any involvement of any neural structures contributing to these symptoms such as . . . [a] nerve root or spinal cord problem."  Id.  The abnormal conduction studies were hypothesized to be related to neuropathy secondary to degenerative disc disease in the

14

upper spine.  Id.  Another concern, with "his diabetes . . . [and] associated peripheral neuropathy, [is that Kenneally] certainly is more at risk than the general population for getting [carpal tunnel syndrome]."  T. 377.

On January 11, 2002, Kenneally had a follow-up examination by Dr.  Carl who interpreted Dr. Murnane's results.  T. 379.  Dr. Carl stated that the radiology reports indicated proper alignment of the upper spine, many of Kenneally's neck and back problems were arthritic as confirmed by the various radiology reports, and the potential carpal tunnel syndrome and neuropathy were secondary to his diabetes.  Id.  Kenneally was taking muscle relaxants, but because they caused grogginess, he only took them at night.  Id.

On March 11, 2002, Kenneally was examined by Dr. Grosvenor who approved his return to work.  T. 390.  Kenneally had been denied disability benefits three times, could not afford to remain unemployed, and had sought medical treatment, both physical and mental, throughout the entire process.  T. 390.  On June 21, 2002, Kenneally underwent surgery to repair the carpal tunnel syndrome in his left hand.  T. 491-92.  Kenneally was cleared to return to work at the end of August 2003.  T. 495.

Throughout the Fall of 2003, Kenneally complained of abdominal pain and nausea.  T. 396-404, 470-79.  On August 13, 2003, Kenneally's gall bladder was removed and his pancreas was evaluated.  T. 407, 412.  The evaluation showed a thickening which indicated either pancreatitis or a pancreatic mass.  T. 412-413.  After ultrasounds, Kenneally was diagnosed with a pancreatic mass.  However, as of February 2, 2004, Kenneally's abdominal symptoms had resolved.  T. 408, 413, 488.

On March 11, 2004, Kenneally underwent another medical assessment with

15

Occupational Medical Services and Dr. William Rogers.  T. 432-35.  Kenneally indicated that his abdominal pain, which had persisted for three to four months, had improved and he had not experienced any recent episodes of nausea or vomiting.  T. 432-33.  Kenneally stated that despite the aches in both knees, walking on flat ground was well tolerated and he had not experienced any swelling, giving way, or locking.  T. 433.  Dr. Rogers noted that the main problem was the chronic back pain which had been present for almost five years, manifested itself as chronic bilateral lumbar discomfort, and resulted in three MRIs and two months of physical therapy.  Id.  The pain was aggravated by climbing stairs, sitting for more than an hour at a time, being on his feet for more than twenty minutes at a time, or lifting more than light groceries.  Id.

Upon examination, Dr. Rogers noted full range of motion in the upper spine and all joints in the upper extremities and a limited range of motion in the lower spine, a slow hesitant gait, and minimal crepitus in the knees with a slightly limited range of motion which did not prevent Kenneally from mounting and dismounting the examination table.  T. 434-35.  Review of the radiology tests revealed (1) unremarkable x-rays of both knees, (2) mild disk space narrowing at L3-4, L4-5, and L5-S1, (3) slight generalized narrowing at T12-L1, (4) probable slight narrowing of the lower portion of the right SI joint, and (5) Schmorl's node deformities which were of limited clinical significance.  T. 436.  Dr. Rogers concluded that Kenneally could (1) frequently lift ten pounds, (2) stand and walk at least two hours in an eight-hour day, (3) sit less than six hours in an eight-hour work day, (4) push and pull with his lower extremities on a limited basis, (5) occasionally stoop, crawl, crouch, and kneel, and (6) never climb on ropes, ladders, or scaffolding.  T. 437-38.

16

A month later, Medical Expert Richard Goodman explained that Kenneally did not qualify as having a listed impairment since he did not have "a herniated disc, . . . there is no evidence of nerve root compression . . . , limitation of motion, motor loss, reflex loss and sensory loss . . . [and] there is no mention of lumbar spinal stenosis which much be established by an appropriated medically accepted imag[e]."  T. 452. Despite Kenneally's claims of back pain, Goodman determined that there was no medical evidence to support Kenneally's allegations.  T. 458.  Additionally, Goodman concluded that Kenneally had no exertional limitations lifting, carrying, standing, walking, sitting, pushing, or pulling, or postural limitations with climbing, balancing, kneeling, crouching, or crawling.  T. 453-56.

On April 15, 2004, Kenneally was again examined by Dr. Carl.  T. 489. Kenneally had last been examined by Dr. Carl fifteen months earlier.  Id.  Kenneally reported that between April and July , 2003, he had worked at McDonald's, developed gastrointestinal problems, and the pain in his back was starting to reoccur.  Id.  The recurrent pain may have been linked to Kenneally's recent cessation of Motrin, and only affected his back and not his legs.  Id.  Dr. Carl found evidence of arthritic changes but did not find any new developments and recommende continued over-the-counter pain medication.  Id.


### 4. Kenneally's Testimony

Kenneally testified at two administrative hearings before ALJ Stephan in 2004. T. 533-602.  Kenneally explained that he worked at the game farm until June 1999 when his back hurt so badly that he was forced to quit.  T. 539-40.  However, in 2002

17

he returned to the game farm, although he could not lift or carry pails of feed to the animals.  T. 542.  Kenneally worked at the game farm for four months, underwent the carpal tunnel release, returned to work at the end of August, became ill with abdominal problems, and returned to work at McDonald's from March to July, 2003.  T. 537, 539-40, 589-92.

Kenneally testified that he suffered sharp, constant pain in his feet and legs which was aggravated the longer he was on his feet and working.  T. 544-45.  While the pain was intermittent, it did not allow him to bend or carry heavy things.  T. 547.  The pain limited his ability to ambulate and required frequent c rest.  T. 545.  Kenneally walked from his house to retrieve the mail, which took approximately ten minutes.  Id. He only drove twice a week to the store and to the doctor's office.  T. 588.

Kenneally further testified that he had trouble tying his sneakers and buttoning his shirt.  T. 549.  He did little around the house.  T. 550, 553.  He was unable to do any outdoor maintenance, go grocery shopping, or do household chores.  T. 551, 54. Kenneally spent his day sitting and watching television, standing occasionally to stretch his back.  T. 554, 556.  Kenneally had difficulty sleeping at night because of the pain and napped during the afternoon.  T. 558.

**B. Severity**

Kenneally contends that the ALJ failed properly to assess the severity of his conditions.

As noted, step two of the sequential evaluation process requires a determination

as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities.  See subsection IV(A) supra; 20 C.F.R. § 404.1521(a) (2003).  Where a claimant alleges multiple impairments, a court will consider "the combined effect of all [] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  Id. § 404.1523.  An impairment, or combination thereof, is not severe if it does not impinge on one's "abilities and aptitudes necessary to do most jobs." Id. § 404.1521.  Basic work activities which are relevant for evaluating the severity of a physical impairment include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. . . ." Id. § 404.1521(b)(1).

 "The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability."  DeChirico, 134 F.3d at 1180; see also 20 C.F.R. § 404.1520(d) (2003); Id. at pt. 404, subpt. P. App. 1 (2003)(listing of per se disabling ailments).  Additionally, the regulations state that "if an individual has an impairment that is 'equal to' a listed impairment," that individual is disabled regardless of his or her age, education, or work experience. DeChirico, 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

Kenneally alleges that his musculoskeletal complaints, standing alone or in combination, constituted a disabling condition per se.  The evaluation of Kenneally's back, leg, and knee pain is governed by the section on muscoskeletal loss of function. 20 C.F.R. pt. 404, subpt. P, App. 1.00 (2003). Additionally, Kenneally argues that his carpal tunnel syndrome and neuropathy combined to be of sufficient severity to constitute a disabling condition

Kenneally contends that his back ailments were encompassed within the listed impairments of § 1.00.  For Kenneally's chronic back pain to be considered a listed impairment, his disorder must "result[] in [the] compromise of a nerve rout or [the] spinal cord."  Id. at App. 1.04.   According to Kenneally's medical records, the two listed muscoskeletal impairments most closely related to his symptoms were nerve compression[10] and lumbar spinal stenosis.[11]

The ALJ found that Kenneally's musculoskeletal impairments, specifically the chronic back and knee pain, were severe within the meaning of the regulations.  T. 15. However, the ALJ concluded that they were not among the listed impairments granting him per se disability status.  Id.  Kenneally contends that the ALJ erred.

There is substantial evidence in the record to support the ALJ's findings that Kenneally did not suffer from a listed impairment.  The list of impairments for back injuries required either nerve compression or stenosis.  The record illustrates that diagnostic testing and medical opinions confirmed that there existed neither nerve compression nor stenosis.  T. 131, 132, 133, 163, 173-74, 183-84, 204, 202, 203, 208, 366, 374, 376, 436.  Additionally, the record indicates that Kenneally generally retained full range of motion in his back and, at best, demonstrated only limited ranges of motion a few times during his years of treatment.  T. 161, 183, 351, 434-35.  Furthermore, the

---

[10]This is characterized by limited ranges of motion and positive straight-leg raising.  20 C.F.R. pt. 404, subpt. P, App. 1.04(a)

[11]Stenosis is a narrowing "resulting in [the] inability to ambulate effectively."  20 C.F.R. pt. 404, subpt. P, App. 1.04(c).  The inability to ambulate effectively may be shown by evidence that the claimant (a) could not travel or carry out routine daily activities without assistance, (b) required assistive devices, or (c) was unable to walk a city block.  Id. at App. 1.00(B)(2)(b)(2).

record is devoid of any indication of marked narrowing,[12] herniating, or stenosis.  T. 163, 173-74, 179, 183-84, 202-04, 366, 367, 374, 436.

Moreover, there is no dispute that Kenneally suffered from chronic joint pain in his knees and back.  However, he remained able to (1) ambulate effectively, without assistive devices, (2) mount and dismount the examination table at the physician's office, (3) change his own clothing prior to and after each examination, (4) travel independently in the car, (5) attend to most of his needs for personal care, cooking, finances, and transportation without assistance, and (5) walk ten minutes to retrieve the mail.  T. 160, 161,354, 376, 434-45, 545.  Furthermore, Kenneally's back ailments had not resulted in any motor deficiencies as he was still generally able to attend to his daily personal needs without aassistance.  Therefore, Kenneally has not demonstrated that his back ailments were sufficiently  severe to be classified as a listed impairment.

Kenneally further contends that the combination of his carpal tunnel syndrome and ulnar neuropathy were not properly classified and warrant a finding of a severe disability.[13]  Based on the foregoing, however, it is clear that there is substantial evidence in the record to support the ALJ's finding that these injuries were not sufficiently severe, even in combination, to warrant a conclusion of disability per se. While the record indicates that in early 2002, Kenneally was suffering from neuropathies and carpal tunnel syndrome, on June 21, 2002, he underwent a carpal

---

[12] Radiology reports did indicate slight or probable slight narrowing and slight disc bulges throughout Kenneally's spine.  T. 163, 173-74, 179, 367
[13] The ALJ specifically addressed Kenneally's neuropathy and carpal tunnel syndrome but concluded that Kenneally suffered from, inter alia, severe endocrine and musculoskeletal impairments.  T. 15.

tunnel release.  T. 380-82, 491-92.  The medical evidence indicates that the surgery was successful, Kenneally healed well, and the numbness and tingling abated, his grip strength improved, and he was released to return to work.  T. 494-95.  Thus, these findings constitute substantial evidence that this combination of impairments did not impede Kenneally's ability to perform basic work activities and supports the ALJ's determination to refrain from classifying the ulnar neuropathy and carpal tunnel syndrome as a serious ailment.

Therefore, the Commissioner's determination on this ground is affirmed.

### C.  Subjective Complaints of Pain

Kenneally contends that the ALJ's decision to discredit his subjective complaints of pain was in error.

The ALJ determines whether an ailment is an impairment based on a two-part test.  First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show . . . medical impairment(s) which could reasonably be expected to produce [such] pain. . . ."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 81 (N.D.N.Y. 2005); 20 C.F.R. § 404.1529 (2003).  This primary evaluation includes subjective complaints of pain.  20 C.F.R. § 404.1529 (2003).  "'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.'"  Barringer, 358 F. Supp. 2d at 81 (quoting Crouch v. Comm'r of Soc. Sec. Admin., No. 6:01-CV-0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept.

11, 2003).

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence. 20 C.F.R. § 404.1529 (2003). "Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings." Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir. 1983) (citing Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir. 1983)). However, "disability requires more than mere inability to work without pain." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983). Pain is a subjective concept "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain. Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983). In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings." Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999) (citing Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983)). Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence. Aponte v. Sec'y of HHS, 728 F.2d 588, 591 (2d Cir. 1984).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978). The ALJ must consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

      (I)  [The claimant's] daily activities;

      (ii)  The location, duration, frequency, and intensity of [the

23

claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).

In this case, the ALJ concluded that Kenneally's allegations of disabling pain were not credible because (1) Kenneally returned to work at the game farm in 2002 and McDonald's in 2003, (2) radiology results in the record indicated nothing greater than degenerative changes, (3) the record is devoid of objective medical evidence finding disc herniations, spinal stenosis, or other significant pathologies, (4) despite his many ailments, Kenneally was still not an orthopaedic surgical candidate, (5) despite Kenneally's alleged disabling pain, he did not schedule a doctor's appointment for a fifteen month period in 2003-04. and (6) his medications were limited to the treatment of his diabetes and not his pain.  T. 18.  Thus, there was "no evidence that [Kenneally] experience[d] symptoms of such frequency, intensity or duration as to render him incapable of performing substantial gainful activity on a sustained basis."  Id.

The bases for the ALJ's credibility determination were supported by substantial

24

evidence.  First, as previously discussed, Kenneally remained able independently to complete many of his activities of daily living.  Additionally, even early on in Kenneally's case, he stated that his pain was intermittent, occurring a few times a week and lasting for five to ten minutes at a time.  T. 173.  Kenneally's treatment notes vaguely state that a few months later, he was having difficulty walking but do not indicate the specifics of that difficultly.  T. 189-92.  When Kenneally visited his treating physician in May 2000, no mention was made of arthritis, joint pain, or difficulties with ambulation and range of motion.  T. 352-53.  Furthermore, between approximately February 2003 and April 2004, Kenneally did not once visit his treating orthopaedist.  T. 489.  The ALJ could infer from this an insufficient level of pain to necessitate medical care further corroborated by multiple radiology reports, medical examinations, and treatment notes which indicate little objective medical evidence capable of explaining Kenneally's asserted pain.  When Kenneally did have an appointment with Dr. Carl in April 2004, Kenneally stated that he had worked for four months the previous year and now was starting to experience back pain again, although it was confined to his back and did not affect his legs.  Id.  Kenneally also surmised that this recent onset could be due to his cessation of Motrin.  Id.  Additionally, during his testimony, Kenneally stated that this pain did not persist all the time but it prevented him from obtaining enough sleep at night.  T. 547, 558.  Thus, the record presents substantial evidence reasonably to conclude that the duration, frequency, and intensity of the pain asserted by Kenneally was not as great as Kenneally proffered.

Third, Kenneally stated that standing or sitting in one place and moving around frequently aggravated his back pain.  However, Kenneally also testified that he could

walk and retrieve the mail daily, which took approximately ten minutes round-trip.  T. 545.  Additionally, Kenneally stated that he spent most of his day sitting and watching television.  T. 554, 556.  These statements are inconsistent with Kenneally's contentions that he was physically unable to sit, stand, or walk for any amount of time.

Fourth, the record indicates that Kenneally primarily took Motrin to relieve his pain and underwent only conservative treatment regimes as all four orthopaedists agreed that he was not an appropriate surgical candidate.  However, the fact that Kenneally participated in, and received only conservative treatment, does not mean that Kenneally's credibility was diminished.  See Rivera v. Barnhart, No. 04-CV-6149 (CJS), 2005 WL 3555501, at *9 (W.D.N.Y. Dec. 9, 2005) ("[C]onservative treatment for pain is not, in and of itself, a sufficient basis for rejecting an applicant's complaints.").  However, the fact that Kenneally was examined by multiple providers on multiple occasions for a period of years and had recently gone fifteen months without treatment and pain management only with  Motrin affords substantial evidence to conclude that Kenneally's credibility was questionable.

Finally, Kenneally stated that he would sit and rest while he was employed if he experienced pain and fatigue, he stood to stretch his back occasionally, and he rested during the afternoon to compensate for his lack of sleep at night.  These techniques appeared to work for him while he was employed at the game farm and McDonald's.  Thus, there appears to be substantial evidence to support a finding that Kenneally had developed appropriate coping methods to overcome any pain he may have experienced in the workplace.

Therefore, the Commissioner's determination on this ground is affirmed.

**D. RFC**

Kenneally contends that there exists insufficient evidence in the record to support the ALJ's findings regarding his RFC.  RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms.  Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945 (2003).  "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."  Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy.  New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

Here, the ALJ concluded that Kenneally's impairments prevented him from performing his past relevant work.  T. 17.  The ALJ found that Kenneally retained the RFC to perform jobs where he could "lift and carry ten pounds frequently and twenty pounds occasionally, . . . sit for six hours . . . and . . . stand for two hours per day . . . occasional[ly] stair climb[], stoop[], crouch[] and kneel[]. [Kenneally] should also avoid climbing ladders and scaffolding and should only engage in occasional pushing and pulling with the lower extremities."  T. 15-16.

The ALJ's findings are substantially supported by the record at hand.  First, there have been  three administrative hearings; multiple medical evaluations; and evaluations and treatments by four orthopaedists, an endocrinologist, a neurologist, and his primary care physician.  The record is fully developed and the conclusions of most of the

medical professionals echo the ALJ's findings.  Kenneally's orthopaedists (1) noted

narrowing of the spine, but not sufficiently to require surgery, (2) found unremarkable

results from MRIs of the brain, cervical, and lumbosacral spine, and (3) concluded that,

since nothing was impinging his spinal cord, the abnormalities were degenerative and

arthritic in nature T. 173-74, 203-4, 207-08, 366, 374.  The neurologist concluded that

there was no nerve or spinal cord problem.  T. 376.  The medical examiners noted

unremarkable radiology reports, good ranges of motion, and the ability to transfer on

and off the table which led to the conclusions that Kenneally had minimal exertional

limitations, he did not have a listed impairment, and he was overwhelmingly functional.

T. 432-35, 450-59.[14]

---

[14] When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.   While the treating physician's rule was not argued, the ALJ gave Dr. Grosvernor's opinion little weight because it identified no basis upon which her statements limiting Kenneally to sedentary work were made.  T. 16. First and foremost, the final determination of disability and a claimant's inability to work rests with the Commissioner.  Id. at 133-34; see also 20 C.F.R. § 404.1527(e) (2005).
    Second, before a treating physician's opinion may be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling and the less consistent the opinion is, the less weight it will be given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  As discussed supra, Kenneally was examined and treated by five other physicians, one with a specialty in neurology and the others in orthopaedics.  All agreed that Kenneally's pain was attributable to mild arthritis and degenerative changes.  These conclusions were fully supported in the record by objective medical facts, clinical findings, and testimony by Kenneally.  They stand in contrast to Dr. Grosvernor's opinion but supported the ALJ's conclusions as to Kenneally's RFC.
    Third, to the extent that Kenneally argued that the ALJ improperly failed to credit the opinions of Drs. Lew and Rogers, it is important to note that (1) Dr. Lew made only vague findings that Kenneally had moderate to severe limitations in some areas without further elaboration, and (2) Rogers' exertional limitations did not correspond with his

Specifically, the ALJ appeared to rely upon the medical source statement of Richard Goodman, a practicing orthopaedist, who found that Kenneally had no limitations and there was no evidence of a disabling orthopaedic condition.  T. 452. Although Goodman was a non-treating physician, the regulations permit the ALJ to rely on the opinions of non-examining sources to override treating sources' opinions as long as they are supported by medical evidence in the record.  See 20 C.F.R. § 404.1527(f); see also Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

Additionally, a vocational expert testified that an individual in Kenneally's position was employable as a ticket seller, assember, call-out operator, order clerk, and other sedentary jobs.  T. 567-68.  Even when reducing the estimate of the level of Kenneally's ability to perform tasks of a repetitive nature, Kenneally was still able to secure employment as a call-out operator and surveillance system monitor.  T. 568-572.  The vocational expert stated that even if Kenneally could not use his hands, he could still work as a surveillance system monitor.  T. 574.  Kenneally would only become unemployable if his medication rendered him unable to remain awake or if his pain was so severe that he was unable to concentrate.  T. 576-77.

As discussed supra, there is substantial evidence in the record to support the findings of the ALJ.  Thus, the Commissioner's determination in this regard is affirmed.

---

normal physical examination.  Thus, the ALJ provided good reasons for relying on the opinions of the other medical professionals and discounting the opinions of Drs. Grosvernor, Lew, and Rogers.

## VI. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that the decision denying disability benefits is **AFFIRMED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


DATED: December 18, 2008
        Albany, New York

United States Magistrate Judge